## T. W. EVERETT *vs.* R. HOAPILI BAKER.

SPECIAL TERM, FEBRUARY, 1888.

PETITION FOR A WRIT OF MANDAMUS.

JUDD, C.J., McCULLY, PRESTON, BICKERTON and DOLE, JJ.

The act of His Majesty, in pursuance of the power given him by the Constitution of approving and of disapproving of bills passed by the Legislature, is a personal one and does not require the advice and consent of the Cabinet.

OPINION OF THE COURT, BY JUDD, C.J. MR. JUSTICE DOLE, dissenting.

During the January Term, 1888, application was made to the Justices of the Supreme Court for a Writ of Mandamus. Following is the petition :

The undersigned Thomas W. Everett, of Wailuku, in the Island of Maui, respectfully represents unto this honorable Court as follows to wit :

1. That he is the Sheriff of the said Island of Maui, duly appointed and commissioned, and in the discharge of the duties of said office.

2. That the above named defendant, Robert Hoapili Baker, was prior to and during the 31st day of December, 1887, the duly comissioned Governor of the said Island of Maui, and in the discharge of the duties, and in the possession of all books and records theretofore and then preserved in and as a part of and belonging to the said office of Governor.

3. That by virtue of a statute passed by the Hawaiian Legislature at its extraordinary session in 1887, entitled, " An Act to provide for the discharge of certain duties heretofore performed by the Governors of the different Islands," it became the duty of the defendant to transfer and deliver to the Sheriff of the said Island of Maui certain records of the office of said

Governor of Maui, to wit: the records relating to the administration of oaths and the taking of depositions; the selection and construction of pounds and the appointment and removal of poundmasters; the certification of impressions of brands and marks; the control, preservation and disposition of wrecks and wreckages; the shipping and discharge of seamen, and the testing and certification of weights and measures.

4. That demand has been made upon the said defendant at divers times since the 31st day of December, 1887, to so transfer and deliver to this plaintiff the records aforementioned, but that the said defendant utterly neglected and refused and doth still, although said records are now detained by him the said defendant, neglect and refuse to transfer and deliver the same or any thereof to this plaintiff.

5. That plaintiff is advised and believes that the possession of said records by this plaintiff is necessary to the due administration of the duties of his said office, and if plaintiff should be confined to the ordinary legal forms for the purpose of obtaining the custody of said records, the slowness of such ordinary legal forms would be likely to produce such delay that the public good and the administration of the law would suffer therefrom.

Wherefore the plaintiff prays that there issue out of and under the seal of this Honorable Court an Alternative Writ of mandamus, to be directed to the said defendant Robt. Hoapili Baker, commanding him within a certain time to be therein named, to transfer and deliver to this plaintiff the records aforesaid, or that in default of such delivery, he shall show cause to this Honorable Court, at a time to be in said writ specified, why a peremptory writ of mandate should not issue against him, peremptorily commanding him to transfer and deliver the said records to this plaintiff: and that in default of defendant's showing such cause, such peremptory writ as aforesaid may issue to and against said defendant.

On the return day the respondent filed the following answer and return:

And now comes Robert Hoapili Baker, the above named defendant, and makes this his answer and return to the writ in the above entitled cause and says:

1. That he admits that Thos. W. Everett is Sheriff of the Island of Maui, duly appointed and commissioned, and in the discharge of the duties of said office.

2. That he admits that he was, prior to the 31st day of December, 1887, and says he now is, the duly commissioned Governor of the Island of Maui, and in possession of the records of said office.

3. That he denies that there is in existence any law of this Kingdom which requires him to transfer and deliver to the Sheriff of the said Island of Maui certain records of the office of said Governor of Maui, to wit: the records relating to the administration of oaths and the taking of depositions; the selection and construction of pounds and the appointment and removal of poundmasters; the certification of impressions of brands and marks; the control, preservation and disposition of wrecks and wreckages; the shipping and discharge of seamen: and the testing and certification of weights and measures.

4. That he admits that the demand has been made since the 31st day of December, 1887, to so transfer snd deliver to the plaintiff the records aforementioned.

And this defendant further answering, says that he was commissioned as Governor of said Island of Maui, on the 4th day of October, A. D. 1886, and can only be removed from said office by impeachment.

Wherefore he prays that said petition be dismissed with costs.

The original copy of the Act of the Legislature under disscusion was produced and the certificate of the President of the Legislature, appended to it, was admitted to contain a correct recital of all that was done in the premises. This certificate is as follows:

" I hereby certify that the foregoing Act, having passed its third reading in the Legislature of the Hawaiian Kingdom, on the second day of December, 1887, was presented to his Majesty

the King, through the Cabinet, on the fifth day of December, 1887; that on the ninth day of December, 1887, it was returned to the Legislature by His Majesty the King, unsigned, together with a message setting forth certain reasons why he refused to sign the same; that it appeared that such message was not countersigned by a Minister, and that his Majesty's act in so returning the same was done without the advice and consent of the Cabinet; that thereafter the Legislature adopted are solution that said act of the King, not being countersigned by a Minister and having been done without the advice and consent of the Cabinet could not be considered a refusal to approve the Act within the meaning of Article 48 of the Constitution, which action of the Legislature was duly communicated tò the King; and I do hereby further certify that more than ten days (Sundays excepted) have elapsed since said Act was presented to the King, and that (except as aforesaid) the same has not been returned to the Legislature, and that the Legislature had not adjourned prior to the expiration of said period of ten days.

"Dated Honolulu, Dec. 28, 1887."

The following Articles of the Constitution are involved in this discussion.

Article 48.   Every bill which shall have passed the Legislature, shall, before it becomes a law, be presented to the King. If he approve he shall sign it and it shall thereby become a law, but, if not, he shall return it, with his objections, to the Legislature, which shall enter the objections at large on their journal and proceed to reconsider 'it.   If after such reconsideration it shall be approved by a two-thirds vote of all the elective members of the Legislature it shall become a law.   In all such cases the votes shall be determined by yeas and nays, and the names of the persons voting for and against the bill shall be entered on the journal of the Legislature.   If any bill shall not be returned by the King within ten days (Sundays excepted) after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the Legislature by their adjournment prevent its return, in which case it shall not be a law.

Article 78. Wherever by this Constitution any act is to be done or performed by the King or the Sovereign, it shall, unless otherwise expressed, mean that such act shall be done and performed by the Sovereign by and with the advice and consent of the Cabinet.

Article 31. The person of the King is inviolable and sacred. His Ministers are responsible. To the King and the Cabinet belongs the executive power. All laws that have passed the Legislature shall require His Majesty's signature in order to their validity, except as provided in Article 48.

Article 41. The Cabinet shall consist of the Minister of Foreign Affairs, the Minister of the Interior, the Minister of Finance and the Attorney-General, and they shall be His Majesty's special advisers in the executive affairs of the Kingdom; and they shall be *ex-officio* members of His Majesty's Privy Council of State. They shall be appointed and commissioned by the King, and shall be removed by him only upon a vote of want of confidence passed by a majority of all the elective members of the Legislature, or upon conviction of felony, and shall be subject to impeachment. No act of the King shall have any effect unless it be countersigned by a member of the Cabinet, who by that signature makes himself responsible.

## BY THE COURT.

The certificate attached to the Act under consideration makes it known that the Act was returned by the King unsigned, with a message setting forth certain reasons why he refused to sign the same, and that such message was not countersigned by a Minister, and that His Majesty's act in so returning the same was done without the advice and consent of the Cabinet, and that the Legislature considered that this was not a refusal, or veto as popularly styled, within the meaning of Article 48 of the Constitution.

If there had been a Constitutional veto of the Act or bill, it is clear that by the provisions of Article 48 it was left for the

Legislature to re-consider and make the bill a law by a two-thirds vote of the elective members, and that failing this the bill remained vetoed.

The controlling question then is whether the refusal of the King to sign a bill which has been passed by a majority of the Legislature requires for its validity to be done by the advice and consent of his Cabinet, evinced by the counter-signature of a Minister, or is the individual right of the King.

We are thus led to consider what is the meaning of Article 48 of the Constitution, and whether the power of the King in approving or disapproving of bills passed by the Legislature is controlled by Article 78, and to determine whether Article 48 is an exception to the general words of Article 78. The words in this article which provide for the exceptions to which they shall not apply are, "unless otherwise expressed."

This means that any act which the Constitution requires to be done by the King shall be done by him by and with the advice and consent of the Cabinet, unless the article defining the act to be done shall of itself show that the concurrence of the Cabinet is not required. An illustration of this is found in Article 70, where the King, his Cabinet and the Legislature have the authority to require opinions of the Justices of the Supreme Court. The context shows that as the Cabinet have this authority, and the King also has it, the concurrence of Cabinet is not necessary to enable the King to procure such opinion.

So also in Article 41, where the power is given to the King to appoint and commission his Cabinet, and to remove them upon a vote of want of confidence by the Legislature. From the nature of the act of removal the Cabinet could not withhold their consent to the King's act in removing them. It is here expressed otherwise than that this act requires the advice and consent of the Cabinet.

In Article 48, which prescribes the method by which a bill passed by the Legislature may become law, it is required that such bill shall, as a condition precedent, be presented to the

King. His mind must then act upon it, for "if he approve of it he shall sign it, and it shall thereby become a law." This act of approval implies that he has become acquainted with its contents, and that in the exercise of his judgment he deems it advisable that it become law. The nature of this act requires his reasoning faculties to be exerted as to the necessity and wisdom of the measure. In arriving at his conclusions he may and ought to ask and receive the advice of his Cabinet; but at the final moment of decision he must settle for himself whether the measure shall become law or not; and if this decision can be prevented by the Cabinet, then it is not his act but their act.

Suppose the case of a bill passing the Legislature which the Cabinet thought should not receive the King's approval, but which the King was desirous of approving, could the Cabinet veto such a bill? If so, in what way should their failure to concur be manifested? By omitting to countersign the King's signature. Countersigning by a Minister is not required by Article 48 of the Constitution, which designates the steps to be taken whereby a bill shall become effectual as a law. A construction which would make the Ministerial counter-signature of a law essential to its validity would render invalid every statute passed by the Legislature of this Kingdom since the Constitution of 1864 up to the special session of 1887—including the whole Penal Code—and throw the nation into the direst confusion.

Article 48 also provides that a bill may become a law if the King shall withhold it from the Legislature after the lapse of ten days from the time of its presentation to him. In this case the King does no overt act to the bill. He neither signs the bill nor returns it with his objections. Will it be contended that this constructive approval of the King requires the consent of the Cabinet? If so, how shall it be expressed? By the signature of a Minister when the King's name has not been affixed to the bill.

We think that the plain and obvious meaning of the whole context of Article 48 is that the power of the King to approve or

disapprove a bill is a personal, individual right, and this article standing alone would never have given rise to doubt. Since the 78th Article contains the words "unless otherwise expressed," therefore, any act of the King which does not, by force of the article which defines the act, require the consent of the Cabinet, is excepted from the operation of the general rule laid down in Article 78. By this reasoning we do not find Article 78 to be repugnant to Article 48. Force and effect is given to both articles, which is the proper method of construction. And in this view it is not necessary to discuss the question whether Article 78, being later in the instrument, should control an earlier article.

What is the nature of the act of the King in approving or disapproving a bill? Is it an executive or legislative function? It is to be noticed that Article 48 defining this function is identical with the corresponding article from the Constitution of the United States, altered only so far as to conform to the nature of our Legislature which consists of one House.

Pomeroy, in Section 174 of his Constitutional Law, says: "Although the Constitution, in its general language, vests the legislative power in a Congress which is declared to consist of a Senate and a House of Representatives, yet a reference to other portions of the organic law shows that this Congress does not, in fact, possess the sole legislative function. No law can be passed without the consent of the Executive unless two-thirds of both Houses shall finally concur therein. The assent of the President is as necessary to the enactment of any measure having the nature of law as that of a majority of both branches of Congress. In this the President legislates. His affirmative or negative decision is a step in the process of creating and not of executing laws. By virtue of the various provisions of the Constitution, the Congress is, in fact, though not formally and in terms, composed of three distinct bodies—President, Senate and House of Representatives—and all must concur, with the single exception just noticed, that a two-thirds vote of both the other branches avails against the dissent of the Executive."

In *Fowler vs. Peirce*, 2 Cal., 165, it was held that in approving a statute, the Executive acts as a component part of the law-making power, and his power of approval ceases on the adjournment of the Legislature.

We understand that Von Holst, a German writer, holds a different opinion. But whereas in the United States, since the legislative power is vested by the Constitution in the " Congress of the United States," there may be differences of opinion as to the character of the President's act, the question admits of no doubt as regards the King of these Islands, for Article 44 reads : "The legislative power of the Kingdom is vested in the King and the Legislature, which shall consist of the Nobles and Representatives sitting together."

The King's act in approving or disapproving bills is the exercise of a legislative function, for he is by the organic law a constituent of the law-making body. It cannot be seriously contended that Article 44, above quoted, should be coupled with Article 78, and that without Article 42, which gives the Cabinet seats in the Legislature, they would be vested with legislative power. That the King is a part of the law-making power is further evidenced by Article 76 of the Constitution, which declares that the enacting style in making and passing all Acts and laws shall be : " Be it enacted by the King and the Legislature of the Hawaiian Kingdom."

Article 41 of the Constitution defines the Cabinet, and prescribes that "they shall be His Majesty's special advisers in the executive affairs of the Kingdom." Reading this article with Article 78 leads to the conclusion, which is not a forced one, that the "acts" of the King, which require the advice and consent of the Cabinet, are confined to executive acts, and do not include legislative functions. If Article 41 had made the Cabinet the special advisers of the King on all affairs of the Kingdom, there would be more room for the contention that the " acts " referred to in Article 78 included legislative as well as executive.

It may well be contended that as by the 41st Article the Cabinet are His Majesty's special advisers in the executive

affairs of the Kingdom, and that no act of the King shall have any effect unless it be countersigned by a member of the Cabinet, who by that signature makes himself responsible, the effect of Article 78 is to require in addition the consent of the whole Cabinet, and thus the responsibility is thrown upon the whole, and the inconveniences of a divided Cabinet obviated. The counter-signature of a Minister to a legislative act of the King is not required, because a Minister could not be subjected to impeachment for such an act.

. Since the argument, the Attorney-General has filed a brief in which he says: "It has not hitherto been considered, and I do not think it is necessary that the King's signature to laws be attested by any Minister."

On the argument the Attorney-General strenuously insisted upon such necessity, and quoted from Webster's Dictionary and other authorities as to the meaning of the word "act" in support of his contention.

It seems to us, it being thus conceded that the signature of the King to an Act of the Legislature is not an "act of the King" within the meaning of Article 41, requiring countersigning by a Minister, it follows that the message declining to sign must come under the same rule, and therefore the substantial part of the Attorney-General's position fails.

But it is urged that there is no analogy between the veto power of the President of the United States, which is individual and irresponsible, and that of the King of these Islands, because the President's term of office is limited, and he is subject to impeachment, and in these methods the will of the people may find expression against a vicious use of this power. This argument, as it seems to us, is good reasoning why the framers of the Constitution of the United States were willing to trust the President with this power; but it is no argument against the view that the articles in both the American and Hawaiian Constitutions which define the veto-power of the Chief Executive, being identical in language, do not in both cases entrust them with a power of veto which can be exercised according to individual judgment.

Great Britain is held up as the great exemplar. In that Kingdom, by its unwritten Constitution, the Sovereign has the veto power, but, as the historian Macaulay says: "It is hardly possible to conceive circumstances in which a sovereign so situated can refuse to assent to a bill which has been approved by both branches of the Legislature. Such a refusal would necessarily imply one of two things—that the Sovereign acted in opposition to the advice of the Ministry, or that the Ministry was at issue, on a question of vital importance, with a majority both of the Commons and of the Lords. On either supposition the country would be in a most critical state—in a state which, if long continued, must end in a revolution." Macaulay's History of England, Vol. IV., p. 137.

But this concedes that the naked right of veto exists in the Sovereign of Great Britain, though it would be dangerous to exercise it. Burke, in his letter to the Sheriffs of Bristol, says: "The King's negative to bills is one of the most indisputed of the royal prerogatives, and it extends to all cases whatsoever. I am far from certain that if several laws, which I know, had fallen under the stroke of that sceptre, that the public would have had a very heavy loss. But it is not the propriety of the exercise which is in question. The exercise itself is wisely forborne. Its repose may be the preservation of its existence, and its existence may be the means of saving the Constitution itself on an occasion worthy of bringing it forth."

The parallelism between Hawaii and Great Britain is not perfect, because the latter country has a government by Parliament; the Ministry must have seats in one House or the other, and must be taken from the party who are in the majority.

The Hawaiian Constitution has features resembling that of Great Britain in some respects, and in other respects resembling that of the United States, and has many features differing from both. And where the parallelism fails, the argument by analogy fails with it. We are, therefore, obliged to construe the Hawaiian Constitution by its intrinsic features.

The arguments drawn from English history would have cogency if addressed to a body that were framing a Constitution

for Hawaii, but they are of little weight in ascertaining the true intent and meaning of the instrument now formed and in force as the fundamental law of the land. This Court sits not as a Legislature to make or amend the Constitution, but to discharge the judicial duty cast upon it by the law of interpreting the Constitution.

The preamble of the Constitution, which reads:

"Whereas, the Constitution of this Kingdom heretofore in force contains many provisions subversive of civil rights, and incompatible with enlightened constitutional government:

"And Whereas, it has become imperative, in order to restore order and tranquility, and the confidence necessary to a further maintenance of the present government that a new Constitution should be at once promulgated:

"Now Therefore I, Kalakaua, King of the Hawaiian Islands, in my capacity as Sovereign of this Kingdom, and as the representative of the people hereunto by them duly authorized and empowered, do annul and abrogate the Constitution promulgated by Kamehameha the Fifth, on the twentieth day of August, A. D. 1864, and do proclaim and promulgate this Constitution;" is urged as a strong reason why we should interpret the Constitution to mean that the veto is an act of the King which must have the consent of the Cabinet.

It is evident from the whole scope of the Constitution of 1887 that it was the intention of its framers to curtail the King's power in the government. For example, Article 31 of the Constitution of 1864 read: "To the King belongs the executive power." This article in the Constitution of 1887 reads: "To the King *and the Cabinet* belongs the executive power." By Article 49 of the old Constitution the King's power of veto was *absolute* and final. By returning a bill to the Legislature unsigned and unaccompanied by any objections, it failed to become law, and could not be brought forward thereafter during the same session. By article 48 of the present Constitution this veto is limited, and can be overcome by a two-thirds vote of the Legislature, thus accomplishing a substantial abridgment of the royal power.

It is urged by the Attorney-General that this limitation is ineffective, and that at least thirty-two out of a House of forty-eight members must vote in favor of a vetoed bill to make it law, so that as some sixteen of the members may absent themselves from the House, practically a vetoed bill can only become a law by unanimous consent of the elective members. But the House has the power to compel the attendance of members, and the same difficulties would stand in the way of the passage of a bill if vetoed by the Cabinet.

If the power of veto is vested in the Cabinet, the practical result would be that no measure which they should oppose and vote against could become a law unless two-thirds of the elective members favored it. This would give to Ministers a power unknown in any other country and completely obliterate the legislative power of the King.

The 48th Article requires of the King that if he disapprove of a bill, he sends to the House his objections to it, which are to be entered up on the journal, presumably in order that they may be the subject of discussion when the bill is reconsidered.

Now, if these objections are the Cabinet's objections and not the King's, it would be an idle ceremony for the Cabinet to reiterate, in the form of a Royal Message, objections which they have already urged during the discussion in the Legislature against the passage of the bill.

It is urged that as the 48th article allows only the elective members of the Legislature to vote upon a bill that has been vetoed by the King, and thus the Cabinet are excluded from this privilege, this was so framed in order that the Cabinet should not back up a measure vetoed by themselves, through tne King, by their own votes. Other reasons more satisfactory to us are that the Cabinet were not allowed to vote on a vetoed bill in order that they might not place themselves in a position of open antagonism to the King, and that a measure which the King disapproved of should, in order to become law, have sufficient merits to secure the approval of two-thirds of the House who represent the people, not including the special advisers of the King.

16

ᵜ  · It was said at the argument that a decision contrary to the views of the government would lead to results most disastrous to the present and future welfare of this Kingdom. We do not anticipate such results, but as Judges sworn to discharge our duties conscientiously and fearlessly, we are not moved by such considerations, if we can arrive at conclusions which commend themselves to our consciences and our judgment as we have in this case.

The judgment of the Court is that the Act entitled " An Act to provide for the discharge of certain duties heretofore performed by the governors of the different islands " has not become a law, having been disapproved of by the King in the manner provided for by the Constitution.

We deem the cause shown by the respondent is sufficient and the rule is discharged.

### DISSENTING OPINION OF MR. JUSTICE DOLE.

The legislative bill entitled " an Act to provide for the discharge of certain duties heretofore performed by governors of the different islands," was presented to the King; before the lapse of ten days he returned it to the Legislature, unsigned, accompanied with a communication setting forth his objections to the bill. This communication was not countersigned by a member of the Cabinet, and it is in evidence that such return of the bill, with the statement of the King's objections thereto, was without the advice or consent of the Cabinet.

The issue raised by the pleadings in the case before the Court is, whether this bill became a law upon the lapse of ten days from the time it was presented to the King, according to the provisions of Article 48 of the Constitution.

Article 48 reads as follows : " Every bill which shall have passed the Legislature, shall, before it becomes a law, be presented to the King. If he approve he shall sign it and it shall thereby become a law, but if not, he shall return it with his objections to the Legislature, which shall enter the objections at large on their journal, and proceed to reconsider it. If

after such reconsideration it shall be approved by a two-thirds vote of all the elective members of the Legislature it shall become a law.  In all such cases the votes shall be determined by yeas and nays, and the names of the persons voting for and against the bill shall be entered on the journal of the Legislature.  If any bill shall not be returned by the King within ten days (Sundays excepted) after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the Legislature by their adjournment prevent its return, in which case it shall not be a law."

The respondent claims that the bill in question, having been returned unsigned by His Majesty, with his objections, to the Legislature, and there having been no reconsideration thereof by the Legislature, it has failed to become law by virtue of Article 48.

The complainant, on the other hand, contends that Article 48 is qualified and controlled by the latter clause of Article 41, which reads : " No act of the King shall have any effect unless it be countersigned by a member of the Cabinet, who by that signature makes himself responsible ; " and by Article 78, which reads as follows : " Wherever by this Constitution any act is to be done or performed by the King or the Sovereign, it shall, unless otherwise expressed, mean that such act shall be done or performed by the Sovereign, by and with the advice and consent of the Cabinet ; " and therefore, that the King's act in returning the bill in question to the Legislature with his objections thereto, without the advice and consent of the Cabinet, and without the signature of a member of the Cabinet, upon the statement of the King's objections to the bill, was invalid and not an objection to the bill requiring a reconsideration, as contemplated by the Constitution.

This position is met by the respondent with the argument that the act of returning the bill to the Legislature by the King with his objections, popularly termed a veto, is a legislative act and not an executive one, and that the above quotation from Article 41 refers only to executive acts; in support of this view he

refers to Article 31, which says, "The person of the King is inviolable and sacred. His Ministers are responsible. To the King and the Cabinet belongs the executive power. All laws that have passed the legislature shall require His Majesty's signature in order to their validity, except as provided in Article 48;" and to Article 41, the first part of which has the following : "The Cabinet shall consist of the Minister of Foreign Affairs, the Minister of the Interior, the Minister of Finance and the Attorney-General, and they shall be His Majesty's special advisers in the executive affairs of the Kingdom." The respondent offers the further proposition, that the expression of Article 48 in reference to the application of the Royal signature to legislative bills, and the refusal thereof, withdraws such acts from the rule laid down in Article 78, that is, that the approval and veto of bills by the King are not required to be by the advice and consent of the Cabinet, because it is "otherwise expressed" or provided in Article 48.

The conflict of opinion as to the meaning of the Constitution brought to the attention of the Court by this case, arises partly from the support given by Articles 31 and 41 of the Constitution, above quoted, in favor of the theory that the Ministers are the advisers of the King only "in the executive affairs of the Kingdom," and therefore that they are not his advisers in legislative matters ; and it is argued by the respondent that when a veto message is sent to the Legislature, it being a legislative act, it is not covered by the provision of Article 41, that "no act of the King shall have any effect unless it be countersigned by a member of the Cabinet who by that signature makes himself responsible." There is nothing in the context which tends directly to show that this provision is limited to executive acts and this conclusion must be arrived at, if received at all, through the mental process of argument. If it is necessary to consider it in the light of the whole of Article 41 and of Article 31, it is equally necessary to consider it in the light of Article 78, which comes after the others and thereby has the greater force, which is sweeping in its terms, and which admits of no

exception to its application unless such exception is expressed in the statement of the act to be performed by the King.

Chief Justice Story, in the 190th Section of his Commentaries on the Constitution of the United States, says " a Constitution of Government founded by the people for themselves and their posterity, and for objects of the most momentous nature, for perpetual union, for the establishment of Justice, for the general welfare, and for a perpetuation of the blessing of liberty, necessarily requires that every interpretation of its powers should have a constant reference to these objects. No interpretation of the words in which those powers are granted can be a sound one, which narrows down their ordinary import so as to defeat those objects. That would be to destroy the spirit and cramp the letter." This statement of one of the principles upon which the Constitution of the United States should be interpreted, is as applicable to our Constitution, which we learn from its preamble was founded by the people of the Hawaiian Islands and proclaimed by the King as their representative, for the securing of civil rights and enlightened constitutional government, and for the restoration of order, tranquility and necessary public confidence. The Constitution signifies a new departure, it abrogates the old Constitution, which it declares subversive of civil rights and incompatible with enlightened constitutional government. Our Constitution, then, must be interpreted with a constant reference to civil rights and enlightened constitutional government. Reading it carefully through and considering it as a whole, we find that it exhibits a definite and consistent purpose to attach responsibility to power in every case. I understand by the Constitution that all powers not expressly given are reserved by the people, the source now of all political power, and that they intended that government should be conducted solely for the benefit of the people and not for the benefit of rulers. We find upon an examination of its provisions, that the King may appoint an heir with the consent of the Nobles, that he may proclaim war by consent of the Legislature, that he may with the advice of the Privy Council convene the Legislature to

extraordinary sessions, that he may make treaties affecting the tariff with the approval of the Legislature, that he may coin money and regulate the currency by law, that is, through a legislative enactment, that he may remove members of the Cabinet upon a vote of want of confidence by the Legislature or upon their conviction of felony. In all these cases he acts without prerogative, and by virtue of the advice, consent or conclusions of responsible officers or departments of government. Then in regard to the ·rest of the constitutional acts of the Sovereign, some fifteen in number, we have the sweeping provisions of Article 78, which, it seems to me, may be reasonably said to apply to all constitutional acts of the Sovereign whether executive or legislative, unless an exception is made in the definition of the act itself or of the method of performing it. The cases that I have referred to, in which the King's performance depends upon the action of responsible officers or departments of government, would seem to be the exceptions contemplated by Article 78, in its proviso " unless otherwise expressed."

This brings us to the question whether Article 48 contains expressions which take the act of vetoing a legislative bill out of the rule laid down by Article 78. And I will here refer again to Judge Story's rules of interpretation : " Constitutions are not designed for metaphysical or logical subtleties, for niceties of expression, for critical propriety, for elaborate shades of meaning, or for the exercise of philosophical acuteness, or juridical research. They are instruments of a practical nature, founded on the common business of human life, adapted to common wants, designed for common use, and fitted for common understandings. The people make them, the people adopt them, the people must be supposed to read them with the help of common sense and cannot be presumed to admit in them any recondite meaning." (Story's Com., Section 210.) Also to Cooley's Constitutional Limitations (5 ed), 72. " Narrow and technical reasoning is misplaced when it is brought to bear upon an instrument framed by the people themselves for themselves and designed as a chart upon which every man learned and unlearned may be able to trace the leading principles of government."

The proviso of Article 78 is "unless otherwise expressed." In the case of exceptions above referred to, it is provided that the act shall be done by the King by virtue of some other authority, as for instance, it is provided in Article 28 that "in any great emergency he (the King) may, with the advice of the Privy Council, convene the Legislature in extraordinary session." In Article 48 the provision in regard to the act of veto is as follows: "If he approve he shall sign it and it shall thereby become a law, but if not he shall return it, with his objections, to the Legislature." I fail to see any language here which excepts the veto act from the rule of Article 78, or which appears to do so. Such exception must be unequivocally expressed in words. It is not sufficient that a skillful logician might base a respectable argument upon the above quoted words in favor of the theory of the respondent. If the words taken in their common, plain, every-day meaning do not express an exception on their face, then none can be inferred or forced from them by subtle reasoning. There is no more difficulty in the proposition that the King approves or disapproves by and with the advice of the Cabinet than in the other proposition that he signs or refuses to sign by and with the consent of the Cabinet. We may go further than this and be strictly within the principles of interpretation; if the words are fairly susceptible of both interpretations, which I do not admit, that one must be adhered to which is in sympathy with the spirit and purpose of the Constitution; the object of the Constitution is the securing of civil rights and enlightened constitutional government. It seems to me that the grant of the power of veto to the King, independent of all advice or responsible authority, would be an obstacle to the securing of civil rights, a cause of division and conflict between the Crown and the Cabinet and a menace to public tranquility, and therefore inconsistent with the spirit and objects of the Constitution, and unlikely to have been intended by its framers. Is the power of veto as a Royal prerogative and which can only be over-ridden by a two-thirds vote of all the elective members of the Legislature, consistent with enlightened constitutional gov-

ernment? This is a matter of opinion, but the status of the two greatest constitutional governments on earth, those of England and the United States of America, give an unqualified negative to this question. The development of the principle of government by the House of Commons has rendered obsolete the veto power of the English Sovereign. (Cooley's Constitutional Limitations, 154, Note 1.) In America the President, holding office for a brief term and liable to impeachment, may at his own discretion veto a bill from Congress, but it may be passed over his veto by two-thirds of a quorum of each House of Congress.

The contention of the respondent, if correct, makes the veto act a royal prerogative; but the Constitution in Article 30 has defined the royal prerogatives as follows: "It is the King's prerogative to receive and acknowledge public Ministers; to inform the Legislature by royal message from time to time of the state of the Kingdom, and to recommend to its consideration such measures as he shall judge necessary and expedient." This being an affirmative grant of prerogatives to the King implies an exclusion of all others, and is especially decisive against the admission, by means of the interpretations of doubtful expressions, of another prerogative of serious consequence and not in sympathy with the general tenor of the Constitution. The word prerogative, as used in reference to the powers of a Sovereign, has a definite meaning gained through the great conflicts between the Crown and Parliaments of England; it may be said to have no other meaning than given by Webster's Dictionary in the following definitions: "an exclusive or peculiar privilege; prior and indefeasible right; fundamental and essential possession; used generally of an official and hereditary right which may be asserted without question and for the exercise of which there is no responsibility or accountability as to the fact and the manner of its exercise." If the respondent is right in his theory of the case, the Sovereign is entitled to a prerogative in addition to those enumerated in Article 30, and of great importance and far reaching consequences. I am unable to arrive at this interpretation. The question whether the act of veto is

executive or legislative in its nature might be of importance in this case if the 78th Article did not exist, and the 41st and the 31st Articles remained unaffected by other explanatory words; but there can be no question that the 78th Article makes the Cabinet the advisers of the Crown with a controlling authority in all matters of state, legislative as well as executive, except as to those matters which the Constitution otherwise provides for. If the 48th Article is not controlled by the 78th Article, it can only be because its own language distinctly makes it an exception, which, as I have more fully stated above, it does not do.

It may not be necessary that the veto message should be countersigned by a member of the Cabinet, but it is necessary that it should be by and with the advice and consent of the Cabinet, however such consent may be evidenced.

It seems to me, therefore, that the law in question is valid, and that under its provisions the respondent is bound to deliver to the complainant the records referred to in the complaint.

*C. W. Ashford*, (Attorney-General) for the petitioner.

*F. M. Hatch* and *A. Rosa*, for the respondent.